1  ISMAIL J. RAMSEY (CABN 189820)
   United States Attorney
2
   THOMAS A. COLTHURST (CABN 99493)
3  Chief, Criminal Division

4  DANIEL PASTOR (CABN 297948)
   Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-7200
7       FAX: (415) 436-7234
        daniel.pastor@usdoj.gov
8
   Attorneys for United States of America
9

```
                          FILED

                        May 05 2023

                       Mark B. Busby
                CLERK, U.S. DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
                      SAN FRANCISCO
```

10                  UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13  UNITED STATES OF AMERICA,            )  CASE NO. 3:23-mj-70616 MAG
                                          )
14          Plaintiff,                    )  **NOTICE OF PROCEEDINGS ON OUT-OF-**
                                          )  **DISTRICT CRIMINAL CHARGES PURSUANT**
15      v.                                )  **TO RULES 5(c)(2) AND (3) OF THE FEDERAL**
                                          )  **RULES OF CRIMINAL PROCEDURE**
16  HANNA TRINH DINH,                     )
    aka "Hang Trinh Dinh,"                )
17                                        )
                                          )
18          Defendant.                    )

19

20          Please take notice pursuant to Rules 5(c)(2) and (3) of the Federal Rules of Criminal Procedure

21  that on May 4, 2023, the above-named defendant was taken into federal custody pursuant to an arrest

22  warrant (copy attached) issued upon an

23      ☐      Indictment

24      ☐      Information

25      X      Criminal Complaint

26      ☐      Other (describe) _____

27  pending in the Central District of California, Case Number 2:23-mj-01699.  In that case (criminal

28  complaint attached), the defendant is alleged to have violated 18 U.S.C. § 1343 (wire fraud).

The maximum penalties for the violation of 18 U.S.C. § 1343 are: 20 years in prison; 3 years of supervised release; a $250,000 fine or twice the gross gain or gross loss; and a $100 special assessment.

Date:  May 4, 2023

Respectfully Submitted,

ISMAIL J. RAMSEY
UNITED STATES ATTORNEY

*/s/ Daniel Pastor*
DANIEL PASTOR
Assistant United States Attorney

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br>                PLAINTIFF, <br><br> v. <br><br> HANNA TRINH DINH, aka "Hang Trinh Dinh", <br><br>            DEFENDANT | **WARRANT FOR ARREST** <br><br> ON COMPLAINT <br><br> CASE NO.:   2:23-mj-01699-Duty-2 |

To:    UNITED STATES MARSHAL AND ANY AUTHORIZED UNITED STATES OFFICER

**YOU ARE HEREBY COMMANDED** to arrest **HANNA TRINH DINH**, aka "Hang Trinh Dinh," and bring her forthwith to the nearest Magistrate Judge to answer a complaint charging her with Wire Fraud in violation of Title 18, United States Code, Section 1343.

REC: BY AUSA            [Detention]


April 10, 2023
_____
Date

_____
Hon. Pedro V. Castillo, U.S. Magistrate Judge

_____
Signature of Magistrate Judge

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at (location): | | |
| DATE RECEIVED <br><br> DATE OF ARREST | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |

**DESCRIPTIVE INFORMATION FOR DEFENDANT CONTAINED ON PAGE TWO**

## ADDITIONAL DEFENDANT INFORMATION

| RACE: Asian | SEX: Female | HEIGHT: 5'2" | WEIGHT: | HAIR: Black | EYES: Brown | OTHER: |
|---|---|---|---|---|---|---|

| DATE OF BIRTH: 6/19/1958 | PLACE OF BIRTH: | SOCIAL SECURITY NO.: | DRIVER'S LICENSE  N6519857 | ISSUING  STATE CA |
|---|---|---|---|---|

| ALIASES: | SCARS, TATTOOS OR OTHER DISTINGUISHING MARKS: |
|---|---|

| AUTO YEAR: | AUTO MAKE: | AUTO MODEL: | AUTO COLOR: | AUTO LICENSE NO.: | ISSUING  STATE |
|---|---|---|---|---|---|

| LAST KNOWN RESIDENCE: | LAST KNOWN EMPLOYMENT: |
|---|---|

FBI NUMBER:

ADDITIONAL INFORMATION:

| INVESTIGATIVE AGENCY NAME: | INVESTIGATIVE AGENCY ADDRESS: |
|---|---|

NOTES:

**WARRANT FOR ARREST ON COMPLAINT**                    Page 2 of 2

AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

4/10/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ TV _____ DEPTUY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

April 10, 2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MR _____ DEPUTY

United States of America

v.

Anthony Hao Dinh,
Hanna Trinh Dinh, aka "Hang Trinh Dinh", and
Matthew Hoang Ho, aka "Mat Hoang Ho",

            Defendants.

Case No.  2:23-mj-01699

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

**Counts 1-2**
[18 U.S.C. §§ 1343, 2(a)]
[Defendants A. DINH, H. DINH, HO]

Beginning no later than on or about March 31, 2020, and continuing until at least on or about March 8, 2022, in Orange County, within the Central District of California, and elsewhere, defendant ANTHONY HAO DINH, defendant HANNA TRINH DINH, aka "Hang Trinh Dinh", and defendant MATTHEW HOANG HO, aka "Mat Hoang Ho", knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud various lenders and the Small Business Administration ("SBA") as to material matters, and to obtain money and property from various lenders and the SBA by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

Count 1: On or about June 19, 2020, in Orange County, within the Central District of California, and elsewhere, defendant A. DINH and defendant HO, each aiding and abetting one another, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of an item by means of wire communication in interstate commerce, namely, the submission of a Paycheck Protection Program ("PPP") loan application on behalf of Global Prestige Company Inc. to Lender 1 from Westminster, California, which was processed by Lender 1 using a server outside the state of California, in violation of 18 U.S.C. § 1343.

Count 2: On or about June 26, 2020, in Orange County, within the Central District of California, and elsewhere, defendant A. DINH and defendant H. DINH, each aiding and abetting one another, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of an item by means of wire communication in interstate commerce, namely, the submission of a PPP loan application on behalf of H.D. Financial Firm to Lender 1 from Newport Coast, California, which was processed by Lender 1 using a server outside the state of California, in violation of 18 U.S.C. § 1343.

AUSA: Roger A. Hsieh (x0600)

**Count 3**
[18 U.S.C. § 1347]
[Defendant A. DINH]

Beginning no later than on or about July 2, 2020, and continuing until at least on or about April 8, 2021, in Orange County, within the Central District of California, and elsewhere, defendant A. DINH knowingly, willfully, and with the intent to defraud, executed a scheme and artifice:  (1) to defraud a health care benefit program, namely, the Health Resources and Services Administration ("HRSA"), as to material matters; and (2) to obtain money from HRSA by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts, in connection with the delivery of and payment for health care benefits, items, and services.  On or about October 26, 2020, defendant A. DINH knowingly and willfully executed the above-described fraudulent scheme by submitting and causing to be submitted a false and fraudulent claim received by HRSA, namely claim number CH32733249 for patient A.R., for which HRSA paid approximately $6,454 for procedure code 31298, in violation of 18 U.S.C. § 1347.

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

_____
Andrew Yue, IRS-CI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    ___April 10, 2023___          _____
                                        *Judge's signature*

City and state:   Los Angeles, California      _____
                                        Hon. Pedro V. Castillo, U.S. Magistrate Judge
                                        *Printed name and title*

AUSA: Roger A. Hsieh (x0600)

## Table of Contents

I.    INTRODUCTION............................................. 3

II.   PURPOSE OF AFFIDAVIT..................................... 3

III.  PREMISES AND PERSONS TO BE SEARCHED..................... 5

IV.   ITEMS TO BE SEIZED...................................... 6

V.    SUMMARY OF PROBABLE CAUSE............................... 6

VI.   STATEMENT OF PROBABLE CAUSE............................. 8

      A.   RELEVANT INDIVIDUALS AND ENTITIES................8

      B.   A. DINH, H. DINH, and HO's PPP/EIDL FRAUD SCHEME
           ..............................................11

           1.   Background on the PPP and EIDL Program.....11

           2.   Summary of Fraudulent Applications by A.
                DINH, H. DINH, and HO.....................14

           3.   Fraudulent PPP And EIDL Program Applications
                by A. DINH................................14

           4.   Fraudulent PPP And EIDL Program Applications
                by H. DINH................................24

           5.   Fraudulent PPP Applications by HO.........28

      C.   HRSA UNINSURED PROGRAM FRAUD SCHEME AND THE
           SUBJECT PREMISES..............................32

           1.   Background on the HRSA Uninsured Program...32

           2.   Fraud Referral Regarding A. DINH..........36

           3.   Claims Data...............................36

           4.   Patient Interviews........................40

           5.   A. DINH's 15 Calls with HRSA..............50

           6.   Interview of A. DINH......................50

           7.   Witnesses' Identification of H. DINH as the
                Biller....................................51

           8.   Money Laundering..........................52

VII.  PROBABLE CAUSE THAT THE EVIDENCE SOUGHT IS MAINTAINED
      AT THE SUBJECT PREMISES................................ 54

A.    ELITE ENT and GARDEN GROVE.......................54

B.    ELITE CARE......................................57

C.    ██████████ ...................................60

D.    Types of Records................................64

VIII.    ADDITIONAL TRAINING AND EXPERIENCE ON DIGITAL
DEVICES................................................. 67

IX.   RETENTION OF INFORMATION FOR AUTHENTIC PURPOSES.......... 70

X.    AVOIDING UNNECESSARY DISRUPTION TO BUSINESS OPERATIONS... 71

XI.   SEARCH PROCEDURE........................................ 71

XII. CONCLUSION............................................. 72

ATTACHMENT A-1........................................... i

ATTACHMENT A-2........................................... i

ATTACHMENT A-3........................................... i

ATTACHMENT A-4........................................... i

ATTACHMENT A-5........................................... i

ATTACHMENT A-6........................................... i

ATTACHMENT B............................................. i

I. ITEMS TO BE SEIZED.................................... i

II. SEARCH PROCEDURE FOR DIGITAL DEVICES.................. x

III. SEARCH PROCEDURES FOR HANDLING POTENTIALLY
PRIVILEGED INFORMATION................................. xiv

ATTACHMENT C-1........................................... i

ATTACHMENT C-2........................................... i

ATTACHMENT C-3........................................... i

**AFFIDAVIT**

I, Andrew Yue, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.   I am a Special Agent with the Internal Revenue Service Criminal Investigations and have served in this capacity for approximately 17 years.  As part of my training as a Special Agent, I attended the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training in criminal and financial investigative techniques with an emphasis in accounting and criminal law.  My formal education includes a BA from UC Davis and a JD from the University of San Diego.  I personally have conducted and assisted with various criminal investigations, including those involving violations of the Internal Revenue laws, the Bank Secrecy Act, and the Money Laundering Control Act.  These investigations have involved the use of electronic and physical surveillance; the use of informants and cooperating witnesses; undercover operations; and the preparation and execution of search and arrest warrants.  I have interviewed witnesses, subjects, and targets of investigations, and cooperating defendants.

## II. PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a criminal complaint against, and arrest warrants for, Anthony Hao Dinh ("A. DINH"), Hanna Trinh Dinh, also known as Hang Trinh Dinh ("H. DINH"), and Matthew Hoang Ho, also known as Mat Hoang Ho

("HO"), for violations of 18 U.S.C. § 1343 (wire fraud) and 18
U.S.C. § 1347 (health care fraud; A. DINH only).

3.    This affidavit is also made in support of search
warrants for:  (1) Elite Care Medical Group, Inc. ("ELITE
CARE"); (2) Elite E.N.T. & Plastic Surgery Medical Center, Inc.
("ELITE ENT"); (3) Garden Grove Outpatient Surgery Center
("GARDEN GROVE"); (4) the residence of A. DINH located at ██
██████ Newport Coast, California 92657 █████████████;
(5) the person of A. DINH; and (6) the person of H. DINH, as
described in Attachments A-1 through A-6.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
warrants and does not purport to set forth all my knowledge of
or investigation into this matter.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and in part only, all
amounts or sums are approximate, and all dates and times are on
or about those indicated.

5.    I am investigating this case with agents from other
law enforcement agencies, including Special Agents Christina
Ramirez and Aren Alexander with the U.S. Department of Health
and Human Services Office of the Inspector General ("HHS-OIG").
Special Agent Ramirez has worked for HHS-OIG for approximately
16 years, and Special Agent Alexander has worked for HHS-OIG for

approximately four years.  HHS-OIG agents have expertise in investigating cases involving health care fraud, and I have discussed this case in detail with Special Agents Ramirez and Alexander.

6.   I have also discussed this case in detail with FBI Special Agent Monica Pandis and other law enforcement officers assigned to this investigation.  Special Agent Pandis has worked for the FBI for more than 20 years where she has almost exclusively investigated health care fraud cases.

### III.  PREMISES AND PERSONS TO BE SEARCHED

7.   The premises to be searched are: the business office of ELITE CARE, which is located at 13794 Beach Blvd., Suite B, Westminster, California 92683 ("SUBJECT PREMISES 1"), and is described in more detail in Attachment A-1; the business office of ELITE ENT, which is located at 13132 Magnolia St., Suite A, Garden Grove, California 92844 ("SUBJECT PREMISES 2"), and is described in more detail in Attachment A-2; the business office of GARDEN GROVE, which is located at 13132 Magnolia St., Suite B, Garden Grove, California 92844 ("SUBJECT PREMISES 3"), and is described in more detail in Attachment A-3; and A. DINH's residence of ███████, which is located at ███████, Newport Coast, California 92657 ("SUBJECT PREMISES 4"), and is described in more detail in Attachment A-4 (collectively, SUBJECT PREMISES 1-4 are hereinafter referred to as the "Subject Premises").  Attachments A-1 through A-4 are incorporated herein by reference.

8.    The persons to be searched are A. DINH, who is described in more detail in Attachment A-5, and H. DINH, who is described in more detail in Attachment A-6 (collectively, with the person of A. DINH, the "Subject Persons").  Attachments A-5 and A-6 are incorporated herein by reference.

### IV. <u>ITEMS TO BE SEIZED</u>

9.    The items to be seized are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1035 (false statements relating to health care matters), 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 1349 (conspiracy to commit health care fraud and wire fraud), 18 U.S.C. § 641 (theft of government funds), 18 U.S.C. § 1957 (transactional money laundering), 18 U.S.C. § 1956(a) (concealment money laundering), and 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) (the "Subject Offenses"), as described in Attachment B, which is incorporated herein by reference.

### V.  <u>SUMMARY OF PROBABLE CAUSE</u>

10.   As detailed below, A. DINH, H. DINH, and HO submitted multiple fraudulent loan applications under the federal Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") Program, obtaining over $3 million in loan funds.  The evidence shows that the electronically-submitted loan applications were for businesses that did not have legitimate payroll and lease expenses; the supporting loan documents were fraudulent, such as doctored checks and IRS Forms 941 containing false information about purported payroll expenses; and the loan

proceeds were not used for permissible purposes under the PPP
and EIDL Program such as legitimate payroll and lease expenses.
In an interview, HO admitted that he used a false IRS Tax Form
941 provided by A. DINH to apply for a PPP loan.  There is
probable cause for a complaint and arrest warrants for A. DINH,
H. DINH, and HO for violations of 18 U.S.C. § 1343 (wire fraud),
and to believe that evidence, fruits, and instrumentalities of
this fraud scheme will be found at the Subject Premises and on
the Subject Persons.

11.  In addition, the evidence shows that A. DINH engaged
in a scheme to defraud the Health Resources and Services
Administration ("HRSA") Uninsured Program, a program that
covered only underlined uninsured patients for certain COVID-19 testing and
treatment.  A. DINH was the second highest HRSA biller in the
United States, and he conducted his scheme by submitting
fraudulent claims for treatment of patients who were insured,
billing for services not rendered, and billing for services not
medically necessary.  Law enforcement interviewed approximately
40 patients billed by A. DINH to the HRSA Uninsured Program.
Most of the patients were covered by insurance and all of them
denied receiving medical procedures for which A. DINH billed the
HRSA Uninsured Program.  A. DINH caused the submission of nearly
$230 million in claims to the HRSA Uninsured Program, for which
he was actually paid more than $150 million.  There is probable
cause for a complaint and arrest warrant for A. DINH for
violations of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1347
(health care fraud), and to believe that evidence, fruits, and

instrumentalities of this fraud scheme will be found at the Subject Premises and on the Subject Persons.

## VI. <u>STATEMENT OF PROBABLE CAUSE</u>

12.   The following discussion of the evidence supporting probable cause is divided into the following three sections: (1) <u>Section VI. A</u>: a summary of relevant individuals and entities; (2) <u>Section VI. B</u>: a summary of evidence regarding A. DINH, H. DINH, and HO's wire fraud scheme to apply for and obtain over $3 million in loan funds under the PPP and EIDL Program; and (3) <u>Section VI. C</u>: a summary of evidence regarding A. DINH's health care fraud scheme resulting in over $150 million in payments from HRSA.  Based on my review of law enforcement reports and other documents, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following facts and information.

### A.   RELEVANT INDIVIDUALS AND ENTITIES

13.   A. DINH, a resident of Orange County, California, is a licensed doctor of osteopathy.  A. DINH is an ear, nose, and throat ("ENT") specialist and a facial plastic surgeon according to various medical documents obtained during this investigation. A. DINH resides at ███████ based on California Department of Motor Vehicle ("DMV") records reviewed in April 2023.

14.   H. DINH is a resident of Orange County, California, according to California DMV records, and is A. DINH's sister, according to statements made by A. DINH to law enforcement.

15.   HO is a resident of Jefferson County, Alabama, according to Alabama DMV records, and he is also known to reside in Brevard County, Florida, based on law enforcement encounters with him.  He is a retired physician according to HO's statements to law enforcement.

16.   ELITE CARE is a California corporation registered in 2005 according to the California Secretary of State website. ELITE CARE's principal place of business is 13794 Beach Blvd., Suite B, Westminster, California 92683 (SUBJECT PREMISES 1).  A. DINH is the registered agent for ELITE CARE.  According to its website, elitecaremg.com, ELITE CARE offers primary care services as well as specialties, including plastic surgery and gynecology.

17.   ELITE ENT is a California corporation registered in 2000 according to the California Secretary of State website. ELITE ENT's principal place of business is 13132 Magnolia St., Suite A, Garden Grove, California 92844 (SUBJECT PREMISES 2). A. DINH is the registered agent and is listed as the CEO, CFO, and Secretary of ELITE ENT.

18.   GARDEN GROVE is a California corporation registered in 2001 according to the California Secretary of State website. GARDEN GROVE's principal place of business is 13132 Magnolia St., Suite B, Garden Grove, California 92844 (SUBJECT PREMISES 3).  A. DINH is listed as the registered agent of GARDEN GROVE.

19.   ███████████ is a single-family home located at ██ ███████, Newport Coast, California 92657 (SUBJECT PREMISES 4) according to publicly available realtor websites.  A. DINH and

9

his wife reside at ███████████ based on public record databases, United States Postal Service ("USPS") records, and agent surveillance.

20. Spectrum Network Inc. ("SPECTRUM NETWORK") is a Nevada corporation registered in 2015 according to the Nevada Secretary of State website. A. DINH is listed as the president and treasurer of SPECTRUM NETWORK.

21. Hodigen, Inc. ("HODIGEN") is a Delaware corporation registered in 2018 according to the State of Delaware website. The California Secretary of State website shows that on August 26, 2020, A. DINH filed a Statement and Designation by Foreign Corporation on behalf of HODIGEN in California. A. DINH is listed as the agent for HODIGEN with an address of ███████████ (SUBJECT PREMISES 4), and HODIGEN's listed address is 13794 Beach Blvd., Suite D, Westminster, California 92683 (inside the same building as ELITE CARE (SUBJECT PREMISES 1)) on the California Secretary of State website.

22. HD Financial Firm ("HD FINANCIAL") is a California corporation registered on June 11, 2020, according to the California Secretary of State website. H. DINH is listed as the registered agent of HD FINANCIAL.

23. Global Prestige Company Inc. ("GLOBAL PRESTIGE") is an Alabama corporation registered in 2011, according to the Alabama Secretary of State website. HO is listed as the incorporator, director, and registered agent of GLOBAL PRESTIGE. HO filed a Statement and Designation by Foreign Corporation in California on October 13, 2020, for GLOBAL PRESTIGE.

**B.   A. DINH, H. DINH, and HO's PPP/EIDL FRAUD SCHEME**

   1.   <u>Background on the PPP and EIDL Program</u>

24.  Based on my training and experience, conversations with other law enforcement agents, and investigation in this matter, I understand that the United States Small Business Administration ("SBA") is an executive-branch agency of the United States government that provides support to entrepreneurs and small businesses.  The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

25.  As part of this effort, the SBA facilitates loans through banks, credit unions, and other lenders.  These loans have government-backed guarantees.

26.  The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

27.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP.  In April 2020, Congress authorized over $300 billion in additional PPP funding.

28.  To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, signed by an authorized representative of the business.  The PPP loan

application required the business, through its authorized representative, to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan.  In the PPP loan application, the small business, through its authorized representative, was required to state its average monthly payroll expenses and its number of employees, among other things.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP, and a business could not receive a loan of more than 2.5 times its average monthly payroll costs.  In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

29.  A PPP loan application was processed by a participating financial institution ("lender").  If a PPP loan application was approved, the participating lender would fund the loan using its own monies, which were guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

30.  PPP loan proceeds were required to be used by the business on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities.  Under the applicable PPP rules and guidance, the interest and principal on the PPP loan was eligible for forgiveness if the business was eligible for the PPP loan it received, spent the loan proceeds on these permissible expense items within a designated period of

time, and used a certain portion of the loan proceeds for payroll expenses.

31.  The EIDL Program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

32.  The CARES Act authorized the SBA to provide EIDLs up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses applying for an EIDL.

33.  To obtain an EIDL and an advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDLs for COVID-19 relief, the 12-month period extended from January 1, 2019, to January 31, 2020.  Applicants certified that all the information in the application was true and correct to the best of their knowledge.

34.  EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor.  The amount of the loan was determined, in part, on the information provided by the applicant about employment, revenue, and cost of goods, as described above.

35.  Any funds issued under an EIDL or advance were issued directly by the SBA.  EIDL funds could be used for payroll

expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

      2.   <u>Summary of Fraudulent Applications by A. DINH, H. DINH, and HO</u>

36.  Based on my conversations with other law enforcement officers and review of documents, including loan files, I understand that from approximately March 31, 2020, to March 18, 2021, A. DINH, H. DINH, and HO submitted approximately 70 fraudulent PPP and EIDL Program loan applications to federally insured banks and the SBA on behalf of entities controlled by A. DINH, H. DINH, or HO, of which 21 were approved, resulting in the disbursement of over $3 million in loan funds.

37.  The fraudulent loan applications included material misrepresentations as to the entities' business activities, payroll, and number of employees, and included false tax documents, bank records, and other documents.

38.  Once the lenders disbursed the loan funds, the funds were not used for purposes authorized by the PPP and EIDL Program such as payroll costs, mortgage interest, rent, and utilities, as described below.

      3.   <u>Fraudulent PPP And EIDL Program Applications by A. DINH</u>

39.  A review of PPP loan applications, bank records, information provided by the IRS, and other documents support that A. DINH submitted or caused to be submitted at least 60 fraudulent PPP and EIDL Program loan applications, seeking over $7 million and obtaining $2,809,758 in loan funds. Additionally, A. DINH submitted multiple fraudulent applications

for PPP loan forgiveness, beginning on or about June 16, 2021, and continuing through on or about March 8, 2022, ultimately obtaining loan forgiveness for more than $1 million in loan funds.

40.   A. DINH applied for PPP and EIDL Program loans on behalf of 20 different entities, 17 of which have a purported address of 13794 Beach Blvd., Westminster, California 92683. The loan applications and accompanying documents list Suites A, B (the location of ELITE CARE (SUBJECT PREMISES 1)), C, D, E, and F as the business locations for the various entities.

41.   Examples of the fraudulent loan applications submitted by A. DINH follow.

### a. April 29, 2020, SPECTRUM NETWORK Application

42.   On April 29, 2020, a PPP loan application on behalf of SPECTRUM NETWORK was submitted to Lender 1, seeking $313,080 in loan funds and electronically signed by A. DINH.  As noted in paragraph 20, above, A. DINH is listed as the president and treasurer of SPECTRUM NETWORK.  According to internet protocol ("IP") address records, the loan application was submitted from the business address of ELITE ENT (SUBJECT PREMISES 2) in California.  As noted in paragraph 17, above, A. DINH is the registered agent of ELITE ENT and is listed as the CEO, CFO, and secretary.

43.   The loan application listed ▇▇▇▇▇▇@yahoo.com as the contact email address, ▇▇▇▇▇▇-8441 as the contact phone number, and 13794 Beach Blvd., Suite E, Westminster, California 92683 as the business address.  It appears that the contact

phone number erroneously listed the area code as "███" instead of "███" because the phone number ███████-8441 is the service phone number for ELITE ENT according to AT&T records.[1] Subscriber records from Yahoo! show that ████████@yahoo.com was established on March 31, 2020, from an IP address associated with ELITE ENT.

44.   The application claimed that SPECTRUM NETWORK was in operation as of February 15, 2020; A. DINH was the CEO and sole owner of SPECTRUM NETWORK; and SPECTRUM NETWORK had 12 employees and an average monthly payroll of $125,232.

45.   The PPP loan application was electronically signed by A. DINH, who certified that the funds would be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments.   A. DINH also certified that all information provided was true and accurate, and that he understood that knowingly making a false statement to obtain a PPP loan is punishable under federal law.

46.   Included in the supporting documentation that A. DINH provided with the April 29, 2020 PPP loan application was a purported IRS Form 941[2] for January 1, 2020, through March 31, 2020, in the name of SPECTRUM NETWORK.   The purported Form 941 indicated SPECTRUM NETWORK paid $307,187.34 in wages during that

[1] A public records search shows that the area code ███ is associated with Santa Ana, California, and that the area code ███ is associated with the State of Wisconsin.
[2] IRS Form 941 is a quarterly Federal Tax Return filed by an employer to report income taxes, Social Security tax, or Medicare tax withheld from employees' paychecks.   The IRS keeps a record of IRS Forms 941 filed by an employer.

time.  Records from the IRS reveal that SPECTRUM NETWORK never filed a Form 941 with the IRS from January 2018 through June 30, 2020.  There is no record of SPECTRUM NETWORK ever filing any corporate income tax returns with the IRS for the tax years 2018 through 2020.

47.  According to Nevada Secretary of State records, the registration for SPECTRUM NETWORK was revoked as of September 1, 2022.

48.  On May 1, 2020, Lender 1 approved the PPP loan application for SPECTRUM NETWORK, and Lender 1 deposited $313,080 in loan funds from a bank in Utah into SPECTRUM NETWORK's JP Morgan Chase bank account ("SPECTRUM NETWORK Chase Account 1") in California.  One day prior to the $313,080 loan disbursement from Lender 1, SPECTRUM NETWORK Chase Account 1 had an ending balance of only $1,949.43.

49.  JP Morgan Chase records show that A. DINH opened SPECTRUM NETWORK Chase Account 1 in the name of SPECTRUM NETWORK on March 10, 2017, with an address of 1212 South Casino Blvd., Las Vegas, Nevada 89104.  A. DINH is the sole signatory on this account.

50.  A financial analysis of SPECTRUM NETWORK Chase Account 1 showed that between January 1, 2019, and April 29, 2020, there were no deposits or expenditures indicative of an ongoing business.  Nearly all the deposits into the SPECTRUM NETWORK Chase Account 1 during that time were deposits by or bank transfers with bank accounts for other companies owned by A. DINH or A. DINH's personal bank accounts.  Similarly, there

appear to be no expenditures prior to April 29, 2020, that would indicate payroll or leasing expenses.[3]

51.   Following the May 1, 2020 PPP loan funding, A. DINH transferred nearly all the PPP loan proceeds to accounts for other entities for which he was the owner.  Bank records show that A. DINH identified payments as purported "payroll" and "lease" payments on checks written from SPECTRUM NETWORK Chase Account 1.  However, bank records show that prior to the funding of the PPP loan, SPECTRUM NETWORK Chase Account 1 had not been used to make payroll or lease payments to these entities.

52.   Bank records show that A. DINH issued checks from SPECTRUM NETWORK Chase Account 1 totaling over $150,000 payable to another company he owned, and that company then issued checks to A. DINH and his spouse as payroll checks totaling over $150,000.  A. DINH also issued checks from SPECTRUM NETWORK Chase Account 1 totaling over $150,000 to two other companies he owned, Prestige Property Investment Company LLC and Prestige Property Investment Co., Inc., and identified the checks as lease payments in the memo section of the checks.  The funds eventually were used to pay credit cards, pay property taxes on A. DINH's personal residence at ███████ (SUBJECT PREMISES 4), make IRS payments, or were eventually deposited into A. DINH's personal investment accounts.

---

[3] There is one check from the SPECTRUM NETWORK Chase Account 1 dated on or about July 8, 2019, for $3,550.00 to "Tony Rodriguez," the purpose of which is currently unknown.  Nothing was notated in the memo line of the check.

53.  On September 20, 2021, A. DINH applied for loan forgiveness for the April 29, 2020 PPP loan application.  In support of the loan forgiveness application, A. DINH submitted a copy of a check from SPECTRUM NETWORK Chase Account 1, which was a purported "lease payment" to "Prestige Property Investment." According to the California Secretary of State website, A. DINH was listed as president, incorporator, and manager of Prestige Property Investment Co., Inc. until April 2022.[4]  Lender 1 denied the loan forgiveness application due to "potential fraud."

**b.   May 15, 2020, SPECTRUM NETWORK Application**

54.  Loan application records show that on May 15, 2020, another PPP loan application on behalf of SPECTRUM NETWORK, and electronically signed by A. DINH, was submitted to Lender 2, seeking $392,600 in loan funds.  IP address records show that the application was submitted from A. DINH's personal residence at ███████ (SUBJECT PREMISES 4) in California, and the loan application was received by the SBA in Sterling, Virginia.

55.  The May 15, 2020 loan application listed ███████@yahoo.com as the contact email address, ███████ 7130 as the contact phone number, and 13794 Beach Blvd., Suite E, Westminster, California 92683 as the business address. Subscriber records show that the email account was established

---

[4] California Secretary of State records for Prestige Property Investment Co., Inc. identified A. DINH as president, incorporator, and manager until April 2022 when a Statement of Information was filed identifying A. DINH's wife as CEO, CFO, secretary, director, and registered agent, of Prestige Property Investment Co., Inc.  This change was made after agents conducted an interview on March 22, 2021, with A. DINH regarding his billing to the HRSA Uninsured Program.

just one day before, on May 14, 2020, with the name of A. DINH
and a recovery telephone number of ██████-7130. Subscriber
records for that telephone number reveal that the subscriber is
ELITE ENT and the contact name is A. DINH.

56.  The May 15, 2020 loan application claimed that
SPECTRUM NETWORK was in operation as of February 15, 2020; A.
DINH was the CEO and sole owner of SPECTRUM NETWORK; and
SPECTRUM NETWORK had 14 employees and an average monthly payroll
of $157,042.  The April 29, 2020 SPECTRUM NETWORK loan
application, however, stated that A. DINH had 12 employees and
an average monthly payroll of $125,232.

57.  In the May 15, 2020 loan application, A. DINH falsely
certified that from February 15, 2020, through December 31,
2020, SPECTRUM NETWORK had not and would not receive another
loan under the PPP, when in fact SPECTRUM NETWORK had already
received another PPP loan for $313,080 on May 1, 2020, from
Lender 1, as detailed in paragraph 48, above.

58.  The May 15, 2020 loan application included a purported
IRS Form 941 that stated SPECTRUM NETWORK paid $314,084.01 in
wages from January 1, 2020, through March 31, 2020.  The listed
wages conflict with the purported IRS Form 941 submitted in
support of the April 29, 2020 loan application, which stated
that SPECTRUM NETWORK paid $307,187.34 in wages during the same
time.  As noted in paragraph 46, above, IRS records show that no
Forms 941 were filed from January 2018 through June 30, 2020, on
behalf of SPECTRUM NETWORK, and there is no record of SPECTRUM

NETWORK ever filing any corporate income tax returns with the
IRS for the tax years 2018 through 2020.

59.   Bank records show that on March 10, 2017, A. DINH
opened a second SPECTRUM NETWORK Chase Account ("SPECTRUM
NETWORK Chase Account 2") in the name of SPECTRUM NETWORK, with
an address of 1212 South Casino Blvd., Las Vegas, Nevada 89104.
A. DINH is the sole signatory on this account.  On May 29, 2020,
Lender 2 approved the May 15, 2020 loan application for SPECTRUM
NETWORK and deposited $261,736.38 into SPECTRUM NETWORK Chase
Account 2.  The ending balance on SPECTRUM NETWORK Chase Account
2, the day prior to this deposit, May 28, 2020, was 27 cents.

60.   Bank records show that on July 6, 2020, A. DINH opened
a third business checking account for SPECTRUM NETWORK at JP
Morgan Chase ("SPECTRUM NETWORK Chase Account 3") with an
address of 1212 South Casino Blvd., Las Vegas Nevada 89104.  A.
DINH is the sole signatory of this account.  On that same day,
A. DINH transferred the PPP funds from SPECTRUM NETWORK Chase
Account 2 to SPECTRUM NETWORK Chase Account 3.  From July 7,
2020, through December 4, 2020, the only activity in SPECTRUM
NETWORK Chase Account 3 consisted of checks issued to other
companies owned by A. DINH, and some of the payments were
identified in memo lines as payroll and lease payments, similar
to those described in paragraphs 51-53, above.

61.   On October 18, 2021, A. DINH applied for loan
forgiveness for the PPP loan application submitted on May 15,
2020, to Lender 2.  According to IP address records, the loan

forgiveness application was submitted from his personal
residence at ████████████ (SUBJECT PREMISES 4).

62.  In support of the October 18, 2021 loan forgiveness
application, A. DINH submitted an altered check along with a
purported repair invoice.  The altered check differs from a copy
of the actual check produced by JP Morgan Chase, as shown below:

   

*Actual Check*                        *Altered Check*

63.  The checks reflect that the memo line was changed from
"Lease JUNE" to what appears to be "TI JUNE".  At this time, I
am unaware of what "TI" refers to.

64.  Based on the information and documentation provided by
A. DINH, Lender 2 approved loan forgiveness in the amount of
$194,880.86.

**c.   SPECTRUM NETWORK EIDL Applications**

65.  In addition to submitting multiple fraudulent PPP
applications on behalf of SPECTRUM NETWORK, on April 6, 2020,
and June 30, 2020, A. DINH submitted multiple fraudulent EIDL
Program applications on behalf of the same business.

66.  The gross revenues and cost of goods sold listed on
the two EIDL Program applications submitted by A. DINH for
SPECTRUM NETWORK differ significantly.  The April 6, 2020 EIDL
Program application lists SPECTRUM NETWORK's gross revenue as

$32,567 and cost of goods sold as $82,416, whereas the June 30, 2020 EIDL Program application lists SPECTRUM NETWORK's gross revenue as $998,000 -- over 30 times the amount listed in the earlier application -- and cost of goods sold as $336,000. Moreover, on the April 6, 2020 EIDL Program application, A. DINH listed an Employer's Identification Number for a company other than SPECTRUM NETWORK, of which A. DINH was also the listed owner.

###### d.   **August 3, 2020, HODIGEN Application**

67.   On August 3, 2020, a PPP loan application on behalf of HODIGEN was submitted to Lender 3, seeking $292,000 in loan funds and electronically signed by A. DINH.  IP address records show that the application was submitted from A. DINH's personal residence at ▮▮▮▮▮▮▮ (SUBJECT PREMISES 4) in California, and the loan application was received by the SBA in Sterling, Virginia.  The August 3, 2020 loan application listed ▮▮▮▮▮▮@yahoo.com as the contact email address, ▮▮▮▮▮-3087 as the contact phone number, and 13794 Beach Blvd., Suite D, Westminster, California 92683, as the business address. Subscriber records for that telephone number show that the subscriber is ELITE CARE.  Subscriber records reveal that the email address was established in 2004, and the contact name is "Hao Dinh," with a recovery telephone number of ▮▮▮▮▮-7130. As noted above, A. DINH's middle name is "Hao."  Subscriber records reveal that the subscriber to the phone number ending in 7130 is ELITE ENT and the contact name is A. DINH.

68.   The August 3, 2020 loan application claimed that HODIGEN was in operation as of February 15, 2020, and had an average monthly payroll of $116,800.

69.   Included in the supporting documentation that A. DINH provided with the August 3, 2020 PPP loan application was a purported IRS Form 941 for January 1, 2020, through March 31, 2020, in the name of HODIGEN.  The purported Form 941 indicated wages of $350,400.02 were paid during that time.  IRS records show no Forms 941 filed for tax years 2018 through 2021 on behalf of HODIGEN.

70.   The August 3, 2020 loan application was denied by Lender 3.

### 4.   Fraudulent PPP And EIDL Program Applications by H. DINH

71.   Loan application records show that on June 26, 2020, a PPP loan application on behalf of HD FINANCIAL was submitted to Lender 1, seeking $125,000 in loan funds and electronically signed by H. DINH.  IP address records show that the loan application was submitted from ██████████ (SUBJECT PREMISES 4) in California, and the loan application was processed by Lender 1 using a server outside the State of California according to Lender 1.

72.   The June 26, 2020 loan application listed ████████@yahoo.com as the contact email address, ████████-0498 as the contact phone number, and 1403 N. Tustin Ave., Suite 170A, Santa Ana, California 92705 as the business address. Subscriber records reveal that this telephone number is

registered to World Financial Group/H. DINH.  Subscriber records reveal that this email account was established on May 4, 2020, the contact name is A. DINH's spouse, and the recovery telephone number is ███████-7130.  As noted in paragraph 55, above, subscriber records for the 7130 telephone number reveal that the subscriber is ELITE ENT and the contact name is A. DINH.

73.  Loan application records show that on August 3, 2020, another PPP loan application on behalf of HD FINANCIAL was submitted to Lender 3, electronically signed by H. DINH, seeking $135,672 in loan funds.  According to IP address records, the loan application was submitted from California and is subscribed to ██████████████ Lake Forest, California, which is H. DINH's personal residence according to her California driver's license.  The loan was processed from a server outside the State of California according to Lender 3.  The August 3, 2020 loan application listed ██████████@yahoo.com as the contact email address, ██████-0498 as the contact phone number, and 1403 N. Tustin Ave., Suite 170A, Santa Ana, California 92705 as the business address.  This telephone number is registered to World Financial Group/H. DINH according to subscriber records. Subscriber records reveal that this email account was established in 2009 and the contact name is H. DINH with a recovery telephone number of ██████-0498.

74.  In the PPP loan applications, H. DINH claimed that HD FINANCIAL was in operation as of February 15, 2020, and had employees for whom it paid salaries and payroll taxes or paid independent contractors.  H. DINH signed the PPP loan

applications and certified that the funds would be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments.  H. DINH also certified that all information provided was true and accurate, and that she understood that knowingly making a false statement to obtain a PPP loan is punishable under federal law.

75.  According to California Secretary of State records, HD FINANCIAL was not registered until June 11, 2020, about two weeks prior to the submission of the first PPP loan application for HD FINANCIAL.

76.  The PPP loan applications submitted by H. DINH contained conflicting and false statements regarding HD FINANCIAL.  For example:

a.   On the first PPP loan application submitted in June 2020, H. DINH represented that the business had six employees and an average monthly payroll of $50,000.  On the second PPP loan application submitted in August 2020, H. DINH represented that the business had six employees but an average monthly payroll of $54,269.  The applications also list different percentages of ownership by H. DINH.

b.   Bank records show that H. DINH opened a business checking account with Bank of America in the name of "Hang T. Dinh Sole Prop" on September 4, 2019 (the "Bank of America Account").  H. DINH provided an altered bank statement as a supporting document with the first June 2020 PPP loan application to Lender 1.  Comparing the actual bank statement from Bank of America to the purported bank statement submitted

26

in support of the loan reveals that H. DINH changed the name of the account on the actual bank statement from "Hang T. Dinh Sole Prop" to "H.D. Financial Firm." Prior to submission of the first fraudulent PPP loan application, the balance in the Bank of America Account was $1,681.04.

c.   H. DINH also submitted a purported Form 941 for HD FINANCIAL from January 1, 2020, through March 31, 2020, to both Lender 1 and Lender 3. The purported Form 941 indicated HD FINANCIAL paid $162,809.50 in wages during that time. Records from the IRS reveal that HD FINANCIAL never filed a Form 941 with the IRS for the time period January 1, 2020, through March 31, 2020. Moreover, IRS records reveal there have never been any Forms 941 filed from January 2018 through December 31, 2021, on behalf of HD FINANCIAL, and there is no record of HD FINANCIAL ever filing any corporate income tax returns with the IRS for the tax years 2018 through 2021.

77.   Records from Lender 1 show that H. DINH called from telephone number ███████-0498, registered to World Financial Group/H. DINH, and spoke with employees of Lender 1 multiple times regarding her PPP loan application between July 8, 2020, and August 31, 2020. In addition, A. DINH called and emailed Lender 1 to inquire about the PPP loan application.

78.   Loan application records show that both PPP loan applications submitted by H. DINH were denied. Lender 1 denied the first PPP loan application due to "confirmed fraud." Lender 3 denied the PPP loan application due to "not meet[ing] SBA

guidelines" and not being able "to verify average monthly payroll cost from information [] provided."

79.  In addition to these PPP loan applications, on April 1, 2020, and June 30, 2020, H. DINH submitted EIDL Program loan applications to the SBA on behalf of HD FINANCIAL.  The applications listed different amounts of gross revenue ($125,000 versus $655,000) and number of employees (one versus six).  Both applications were denied.

   5.   Fraudulent PPP Applications by HO

80.  Loan application records show that on June 19, 2020, a PPP loan application on behalf of GLOBAL PRESTIGE was submitted to Lender 1, seeking $133,900 in loan funds and electronically signed by HO.  IP address records show that the application was submitted from the business address of ELITE CARE (SUBJECT PREMISES 1) in California, and the application was processed by Lender 1 using a server outside the State of California according to Lender 1.

81.  The June 19, 2020 loan application listed ██████@gmail.com as the contact email address, ███████-3084 as the contact phone number, and 13794 Beach Blvd., Westminster, California 92683 as the contact address. Subscriber records for the email account show that it is registered to "M H".  During an interview with agents on July 11, 2022, HO identified his email address as ██████@gmail.com.

82.  The application claimed that GLOBAL PRESTIGE was in operation as of February 15, 2020, and had employees for whom it

paid salaries and payroll taxes or paid independent contractors. HO signed the PPP loan application and certified that the funds would be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments.  HO also certified that all information provided was true and accurate, and that he understood that knowingly making a false statement to obtain a PPP loan is punishable under federal law.

83.  According to Alabama Secretary of State records, the address for service of legal process listed for GLOBAL PRESTIGE is an address known to be the former residence of A. DINH based on property records.

84.  JP Morgan Chase records show that HO opened a business checking account in the name of GLOBAL PRESTIGE on April 6, 2020 (the "GLOBAL PRESTIGE Checking Account") with an address of 13794 Beach Blvd., Suite F, Westminster, California 92683.  HO is the sole signatory on this account.  On the same date, HO deposited $40,000 from another account in the name of an individual who, during an interview with agents, identified herself as HO's spouse, into the GLOBAL PRESTIGE Checking Account.  HO subsequently wrote two checks totaling $29,000 to A. DINH, but there was no other activity in the account until June 23, 2020, the date that the first PPP loan funds were deposited.

85.  On June 23, 2020, Lender 1 approved the PPP loan application for GLOBAL PRESTIGE and deposited $133,900 in loan funds into the GLOBAL PRESTIGE Checking Account.

86.  The PPP loan application submitted by HO to Lender 1 contains false statements and statements that conflicted with information provided in other loan applications submitted by HO. For example:

a.  In support of the PPP loan application submitted on June 19, 2020, HO submitted a typed statement, writing that "[s]ince Global Prestige Company started on December 22, 2019 . . . we don't have Forms 940, 941, or W-3 for 2019." However, on an EIDL application submitted by HO to the SBA for GLOBAL PRESTIGE on May 21, 2020, HO listed gross revenue of $796,500 from January 31, 2019, through January 31, 2020.

b.  In support of the PPP loan application submitted on June 19, 2020, HO submitted a purported Form 941 for January 1, 2020, through March 31, 2020, in the name of GLOBAL PRESTIGE. The purported Form 941 indicated wages of $160,680.73 were paid during that time.  Records from the IRS reveal that GLOBAL PRESTIGE never filed a Form 941 with the IRS for January 1, 2020, through March 31, 2020.  In an interview on July 11, 2022, HO admitted that the purported Form 941 was provided to him by A. DINH.

c.  Records obtained from Lender 1 reveal that HO initially submitted PPP loan applications on April 30, 2020, and May 3, 2020, on behalf of GLOBAL PRESTIGE.  Included in the supporting documentation for both PPP loan applications submitted to Lender 1 was a purported Form 941 for January 1, 2020, through March 31, 2020, in the name of GLOBAL PRESTIGE. The purported Form 941 indicated GLOBAL PRESTIGE paid $98,674.98

in wages during that time.  Lender 1 denied the loan
applications.  In a July 11, 2022, interview with law
enforcement, HO admitted that after the loan applications were
denied, he asked A. DINH for assistance in getting the PPP loan
approved, and subsequently A. DINH provided him with a new Form
941 showing wages of $160,680.73.  HO then admitted he submitted
the fabricated Form 941 to Lender 1 on June 19, 2020, and knew
that purported wages of $160,680.72 for GLOBAL PRESTIGE were
false.

87.  Loan application records show that on July 15, 2021,
HO applied to Lender 1 for loan forgiveness for the June 19,
2020 PPP loan application for $133,900.  In support of the loan
forgiveness application, HO falsely claimed payroll costs of
$103,906.66 from June 23, 2020, through September 30, 2020, for
GLOBAL PRESTIGE when HO actually used the loan funds to write
checks to A. DINH and other persons and entities associated with
A. DINH.  Lender 1 approved loan forgiveness and forgave
$133,900 in loan funds.

88.  Bank records show that following the checks written to
A. DINH described above, A. DINH then wrote checks back to HO,
HO's spouse, and HO's son, totaling over $65,000.

89.  On July 11, 2022, agents interviewed HO, who admitted
that he submitted the PPP loan applications described above and
acknowledged his signatures on the applications.  HO said that
A. DINH gave him advice on how to fill out the applications.  HO
admitted that he did not file tax returns for GLOBAL PRESTIGE
for tax year 2020 and did not file Forms 940 or 941 for 2019 or

2020.  HO agreed that there were some mistakes on the PPP loan applications.  When asked about payments to his son, HO initially described his son as a "distant uncle," but then admitted he had lied.  When asked about payments to A. DINH, HO stated that A. DINH did consulting work for GLOBAL PRESTIGE, but HO could not identify any specific consulting work.

### C.   HRSA UNINSURED PROGRAM FRAUD SCHEME AND THE SUBJECT PREMISES

90.   As detailed below, there is probable cause to believe that A. DINH executed a scheme to defraud HRSA by submitting fraudulent claims for reimbursement, and that evidence, fruits, and instrumentalities of the Subject Offenses will be found at the Subject Premises.

#### 1.   Background on the HRSA Uninsured Program

91.   Since March 2020, Congress has passed and the President has signed into law several legislative acts designed to provide financial assistance and reimbursements to health care providers treating uninsured individuals during the COVID-19 pandemic.  The CARES Act initially appropriated $100 billion in relief funds and was intended for health care providers to prevent, prepare for, and respond to the coronavirus.  A portion of this funding, provided through the Provider Relief Fund, supported COVID-19 testing and treatment of uninsured individuals.  The Families First Coronavirus Response Act ("FFCRA"),[5] the PPP and Health Care Enhancement Act, and the

---

[5] The FFCRA defines an uninsured individual as someone who is not enrolled in: (a) a Federal health care program (e.g., Medicare or Medicaid), including an individual who is eligible

American Rescue Plan Act of 2021 also appropriated monies to reimburse providers for either the testing or treatment of COVID-19 for uninsured individuals.

92.   HRSA, a federal agency that is part of the U.S. Department of Health and Human Services ("HHS"), oversees and administers these funds for the testing or treatment of COVID-19 for uninsured individuals through the HRSA Uninsured Program. HRSA contracted with UnitedHealth Group to provide infrastructure for the HRSA Uninsured Program for, among other things, a process for patient identification and a system to handle claims processing, which includes the reimbursement to approved providers for COVID-19-related testing and treatment.[6]

93.   Participating in the HRSA Uninsured Program typically involved a provider: (1) enrolling in HRSA; (2) submitting Patient Rosters to HRSA; and (3) submitting claims to HRSA.

94.   Enrolling in HRSA: To participate in the HRSA Uninsured Program, providers were required to meet multiple requirements and attest to certain conditions, including:

a.   That they checked for health care coverage eligibility of patients and confirmed that the patients were

---

for medical assistance by reason of and during any portion of the emergency period; (b) a group health plan or health insurance coverage offered by a health insurance issuer in the group or individual market; or (c) the Federal Employees Health Benefits Program.

[6] HRSA informed providers that it would reimburse for, among other things, COVID-19-testing-related visits in the office setting and COVID-19 treatment during office visits.  Physician claims were required to include a COVID-19-related diagnosis code.

uninsured and did not have coverage under programs such as Medicare or Medicaid.

  b. That any person who knowingly and with intent to defraud the government, filed information containing materially false information, or conceals for the purpose of misleading the government, committed a fraudulent insurance act.

  95. <u>Submitting Patient Rosters to HRSA</u>:  To submit claims for reimbursement for COVID-19 testing and treatment of uninsured individuals, providers were required to first submit patient rosters to the HRSA Uninsured Program.

  a. To document patient eligibility, recipients[7] were required to submit unique identifiable information about uninsured individuals, including the patient's name, date of birth, gender, social security number, state of residence, or state identification/driver's license, to verify patient eligibility.

  b. If a patient's social security number, state of residence, or state identification/driver's license was not submitted, the recipient was required to attest that they had attempted to capture this information before submitting a claim and the patient did not have this information at the time of service, or that the recipient did not have direct contact with the patient and thus did not have an opportunity to attempt to capture this information.

---

[7] HRSA Terms and Conditions defines "Recipient" as the provider with the Tax Identification Number associated with the attestation.

34

c.    Each time a recipient added either an individual patient or a batch of patients to their patient roster, they were required to attest to various terms, including that they had checked for health care coverage eligibility and confirmed the patient was uninsured, and no other payer would reimburse for COVID-19 testing or care for the patient.

96.    Submitting Claims to HRSA: When submitting claims to the HRSA Uninsured Programs, providers, or an individual authorized to attest on behalf of the provider, further certified via acceptance of HRSA Terms and Conditions that:

a.    They provided the items and services to the patients identified on the claim form when submitting claims to the Uninsured Program.

b.    "[A]ll items and services for which Payment is sought were medically necessary as a preventive vaccination for COVID-19, or for care or treatment of COVID-19 and/or its complications, and/or for COVID-19 testing and/or testing-related items and services."

c.    "[T]o the best of [their] knowledge, patients identified on the claim form were Uninsured Individuals at the time the services were provided."

d.    All claims were "true, accurate, and complete."

97.    Additionally, within the HRSA Program Terms and Conditions, the providers were required to "maintain appropriate records and documentation" to substantiate payments made under the HRSA Uninsured Program.  Upon request for such records and documentation, the providers were required to provide them.

35

2.   Fraud Referral Regarding A. DINH

98.   In March 2021, UnitedHealth Group[8] made a referral to law enforcement regarding billing by A. DINH's companies -- ELITE CARE, ELITE ENT, and GARDEN GROVE -- to the Uninsured Program. The referral alleged that A. DINH, through his companies, billed the Uninsured Program for nasal/sinus surgeries on patients who did not receive any other COVID-19-related testing or treatment from other providers. UnitedHealth Group also identified a high volume of patients seen per day. For example, A. DINH submitted claims for 19 sinus surgeries that were purportedly performed in one day, whereas these surgeries are expected to take two to three hours each.

3.   Claims Data

99.   HRSA claims data shows that ELITE CARE, ELITE ENT, and GARDEN GROVE collectively billed over $229 million to the Uninsured Program and were paid over $153 million for dates of service from February 2020 to December 2020:

| Provider Name | Provider TIN | Billed Amount | Paid Amount | Number of Records |
|---|---|---|---|---|
| Elite Care Medical Group | ██████17 | $122,248,021 | $86,716,609 | 24,794 |
| Elite ENT & Plastic Surgery Center | ██████07 | $70,539,452 | $50,619,064 | 14,452 |
| Garden Grove Outpatient Surgery Center | ██████65 | $37,152,256 | $15,854,512 | 5,584 |
| Total | 3 | $229,939,729 | $153,190,185 | 30,907 |

---

[8] HRSA contracted with UnitedHealth Group to administer the HRSA claims website.

100. A review of open-source data through the cdc.gov website, accessed on or about April 7, 2023, reported that A. DINH's businesses, ELITE CARE, ELITE ENT, and GARDEN GROVE, collectively rank as number two in the nation for the total paid in HRSA Uninsured Program monies to providers for COVID-19 related treatment.  ELITE CARE, ELITE ENT, and GARDEN GROVE rank as the number one, two, and three, respectively, in the State of California.

101. As shown below, A. DINH's claims to the Uninsured Program began in February 2020 and increased each month through September 2020, at which time the claims began to decline:



102. HHS conducted an analysis of A. DINH's claims to the Uninsured Program to determine whether the patients billed did in fact have health insurance.  HHS extracted data such as first name, last name, and date of birth from the HRSA Uninsured Program Data and cross-checked with the Medicare and Medicaid program databases.  The analysis revealed that potentially thousands of patients billed by A. DINH did in fact have

Medicare, Medicaid, or both.  Agents from the Defense Criminal
Investigative Service and Amtrak-OIG conducted a separate
analysis, which revealed that A. DINH billed the Uninsured
Program for patients who had TRICARE (health plan for active-
duty military, family, reserve members, and retirees) and AmPlan
(the Amtrak Union Benefits Plan) insurance as well.

103. Agents used the results of the analysis to select
patients to interview, in part to corroborate their identity and
insurance status.  Through approximately 40 interviews of
patients billed by A. DINH to the Uninsured Program, agents
verified that most of the patients identified had insurance at
the time they purportedly received treatment from A. DINH.
Further, agents found that many of the patients that received
COVID-19 testing from one of A. DINH's testing sites were not
asked whether they had insurance.  Some patients who were asked
if they had insurance provided proof of insurance at the time of
the COVID-19 testing.  However, these patients were later billed
to the HRSA Uninsured Program.

104. Medicare records show that A. DINH is a Medicare
provider, and his Medicare enrollment became effective on
January 16, 2019.  As such, A. DINH had the ability to utilize
Medicare's eligibility verification database to verify insurance
information for patients.  Medicare records show that Medicare
paid him for claims submitted by ELITE CARE for procedures
purportedly done on Medicare patients between 2019 and 2021.

105. Medicare records show that 32 of the 40 patients (80%) billed by ELITE CARE to Medicare were also billed to the HRSA Uninsured Program by ELITE CARE, ELITE ENT, and GARDEN GROVE.

106. The following chart lists the top procedure codes billed by ELITE CARE, ELITE ENT, and GARDEN GROVE for which HRSA received claims from on or about July 2, 2020, through on or about April 8, 2021, and paid by the HRSA Uninsured Program:

### Top Procedure Codes Paid

| Rank | Procedure Code | # of Claims | Paid Amount |
|---|---|---|---|
| 1 | 31298 - Dilation of sphenoid and frontal sinus in the nose using an endoscope | 7855 | $ 47,091,310.28 |
| 2 | 31295 - Dilation of maxillary sinus in the nose using an endoscope | 9629 | $ 27,657,979.48 |
| 3 | 99215 - Established patient outpatient visit, total time 40-54 minutes | 10430 | $ 23,906,267.38 |
| 4 | 99205 - New patient outpatient visit, total time 60-74 minutes | 3935 | $ 13,371,199.61 |
| 5 | 99204 - New patient outpatient visit, total time 45-59 minutes | 3847 | $  6,053,070.69 |
| 6 | 31297 - Dilation of sphenoid sinus in the nose using an endoscope | 2023 | $  4,833,765.46 |
| 7 | 31200 - Partial removal of nasal sinus | 2268 | $  4,345,998.68 |
| 8 | 31237 - Biopsy or removal of nasal polyp or tissue using an endoscope | 17561 | $  3,952,809.61 |
| 9 | 30140 - Removal of nasal air passage, under the lining tissue | 9396 | $  3,682,684.38 |
| 10 | 30903 - Complex control of nose bleed | 14653 | $  3,168,121.75 |
| 11 | 31296 - Dilation of frontal sinus in the nose using an endoscope | 2057 | $  2,804,708.95 |
| 12 | 99214 - Established patient outpatient visit, total time 30-39 minutes | 5990 | $  2,245,131.80 |
| 13 | 31030 - Create a window into the nasal (maxillary) sinus | 2007 | $  1,997,081.88 |
| 14 | 31254 - Partial removal of nasal sinus using an endoscope | 1251 | $  1,727,471.25 |
| 15 | 31050 - Incision of nasal (sphenoid) sinus | 1593 | $  1,667,580.52 |
| 16 | 69631 - Repair of eardrum and ear canal with opening to ear bones | 715 | $  1,092,174.48 |
| 17 | 86328 - Test for detection of severe acute respiratory syndrome coronavirus 2 (Covid-19) antibody, qualitative or semiquantitative | 18345 | $    828,342.22 |

107. As the above chart shows, for the top 16 procedure codes, A. DINH was paid nearly $150 million from the Uninsured Program for medical procedures, as compared to only $828,342.22 for COVID-19 testing.  As described below, the 40 patients interviewed told investigators that A. DINH did not actually perform most of the medical procedures billed for those

patients.  In addition, although some of those patients did
receive COVID-19 testing, many did not receive as many tests as
were billed to the Uninsured Program.

       4.   Patient Interviews

    108. From my review of reports and conversations with other
agents, I understand the investigative team interviewed
approximately 40 patients that A. DINH allegedly treated, and
for whom A. DINH billed the Uninsured Program.

    109. Most of the patients interviewed were randomly
selected through a process of identifying patients who were
likely on Medicare or Medicaid and comparing that list to
patients who were billed to the Uninsured Program.  Agents
identified patients meeting these criteria across several cities
and then utilized a random number generator to identify specific
patients to interview.

    110. Despite A. DINH submitting claims to the Uninsured
Program, most of the 40 patients were insured by federal and
state programs, including Medicare, Medi-Cal, TRICARE, and other
insurances.  For the 40 patients interviewed, A. DINH received
nearly $1.4 million in payments under the Uninsured Program.

    111. None of the patients interviewed stated that they
received the medical procedures, including surgeries, billed to
the Uninsured Program by A. DINH.

    112. Further, some of the patients stated that they never
received COVID-19 testing by A. DINH.  For those patients who
recalled receiving testing, most stated that they only received

a COVID-19 finger prick test, but not a nasal swab nor any other type of procedure involving their nose.

113. As discussed below, the claims submitted to the Uninsured Program for many of these patients followed a similar format, in that they included claims for COVID-19 testing, an office visit, and multiple medical procedures on a single day. This billing pattern was repeated across patients throughout the billing to the Uninsured Program by ELITE CARE, ELITE ENT, and GARDEN GROVE.

114. Interviews of A. DINH, Former Employee 1, a volunteer worker at a COVID-19 testing site, and patients, revealed that A. DINH and/or his medical group conducted COVID-19 testing at multiple locations, not just at medical facilities.  These COVID-19 testing sites were within the Los Angeles County and Orange County regions and took place at various locations such as churches or church parking lots, at Thai temple grounds, and at ELITE CARE (SUBJECT PREMISES 1).

115. Evidence that A. DINH knew that the patients billed to the Uninsured Program were insured includes the fact that A. DINH's own patients from ELITE CARE -- where A. DINH was a Medicare provider and owner, CEO, and sole owner as noted below -- were billed to the Uninsured Program.

116. Further, A. DINH billed the Uninsured Program for services allegedly provided to an entire command of National Guard soldiers.  Agents interviewed Witness 1 in March 2022. Witness 1 was a Commander in the National Guard, and s/he was instructed to obtain COVID-19 testing for her/his entire

command.  Witness 1 learned that a clinic located in Santa Ana, California was offering free COVID-19 tests.  In approximately late June 2020, Witness 1 took her/his entire command of about sixty soldiers to the clinic to receive free COVID-19 tests. Witness 1 thought it was weird that no one asked the soldiers, who were dressed in uniform, whether they carried insurance.[9] Witness 1 denied receiving any of the services billed to the Uninsured Program by A. DINH, such as complex control of nosebleed and biopsy using an endoscope, other than a COVID-19 test.

117. Agents obtained medical records from ELITE CARE, ELITE ENT, and GARDEN GROVE in three productions on or about June 7, 2021, February 15, 2022, and March 10, 2022.  A review of the medical records shows that many of the medical records contain the initials "AD" (presumably, for A. DINH) on the signature line.  Other records contain the initials "FB," "MC," or reference that the signature was "On File".  Some initials were unintelligible.  Agents extracted and reviewed medical records for the 40 patients interviewed.  Of those medical records where legible initials were given, most of the medical records contained the initials of "AD".

118. Some features of the handwriting on the medical records obtained from ELITE CARE, ELITE ENT, and GARDEN GROVE appear similar to other records signed by A. DINH.

---

[9] National Guard members are eligible for health insurance through TRICARE.

119. A. DINH received notice of what was being billed to the Uninsured Program: records produced from ELITE CARE include approximately 4,500 pages of electronic provider remittance advice documents, which list the specific procedures that were billed to the Uninsured Program, for specific patients and dates of service.  Similar records were produced from ELITE ENT and GARDEN GROVE.

120. For the patients interviewed who had medical records, some were informed at A. DINH's COVID-19 testing sites that they tested negative for COVID-19 despite their medical record stating that they tested positive.  Additionally, some of the medical records listed symptoms that the patients stated they did not have at the time, such as polyps, loss of taste and smell, and fever.  Further, some patient charts indicated vital sign information, such as height and weight, that was inaccurate.  Examples of patient interviews follow:

a.   **Patient S.S.**

121. Based on a review of Medicare records, S.S. is insured by Medicare.  When interviewed by law enforcement, S.S. stated that s/he was tested for COVID-19 on two occasions in 2020 at a local church because s/he wanted to get tested as a general precaution.  S.S. received a finger prick test.  Agents showed S.S. a copy of her/his patient chart obtained from ELITE CARE, and S.S. stated that s/he did not have the purported symptoms listed on the chart, including nasal congestion, fever, or throat pain.  S.S. also stated that s/he did not receive any of

the procedures listed, including a biopsy of a nasal polyp and treatment for a nosebleed.

122. From June through September 2020, A. DINH billed the Uninsured Program ten times for treatment of S.S. and received $75,727.33 in payments.  These payments were for seven COVID-19 tests, surgical procedures, and office visits.  S.S.'s daughter also was tested for COVID-19 at the church and has private insurance, yet A. DINH billed the Uninsured Program and received $53,656.65 for the daughter's COVID-19 tests, surgical procedures, and office visits.

123. An example of A. DINH's billing for S.S. on a particular day is shown below, including claims for control of a nosebleed, a biopsy, dilation using an endoscope, and an office visit lasting 60-74 minutes.  This pattern of bundled claims for COVID-19 testing, an office visit, and multiple procedures on a single day is generally consistent across the patients billed to the Uninsured Program by A. DINH.  As noted above, S.S. stated s/he did not receive any of these procedures for which A. DINH was paid by the Uninsured Program:

| Date of Service | Provider Name | Provider Address | Amount Paid | Procedure Description |
|---|---|---|---|---|
| 8/5/2020 | ELITE ENT | 13132 MAGNOLIA ST. | $0 | Detection test by nucleic acid for multiple types of respiratory virus, multiple types or subtypes, 3-5 targets |
| 8/5/2020 | ELITE ENT | 13132 MAGNOLIA ST. | $6,454 | Dilation of sphenoid and frontal sinus in the nose using an |

| Date of Service | Provider Name | Provider Address | Amount Paid | Procedure Description |
|---|---|---|---|---|
| | | | | endoscope |
| 8/5/2020 | ELITE ENT | 13132 MAGNOLIA ST. | $198 | Complex control of nosebleed |
| 8/5/2020 | ELITE ENT | 13132 MAGNOLIA ST. | $45 | Test for detection of severe acute respiratory syndrome coronavirus 2 (Covid-19) antibody, qualitative or semiquantitative |
| 8/5/2020 | ELITE ENT | 13132 MAGNOLIA ST. | $4,808 | New patient outpatient visit, total time 60-74 minutes |
| 8/5/2020 | ELITE ENT | 13132 MAGNOLIA ST. | $94 | Biopsy or removal of nasal polyp or tissue using an endoscope |

### b.    Patient N.P.

124. Based on a review of Medicare records, Medicaid records, and by her/his own statements, N.P. is insured by Medicare and Medi-Cal.  N.P. stated that s/he was tested for COVID-19 twice at a Thai temple but was informed that s/he was negative both times.  N.P.'s medical records from ELITE ENT, however, show positive test results and symptoms, which N.P. stated s/he did not have.

125. N.P. stated that s/he received COVID-19 finger prick tests.  Contrary to what was indicated in N.P.'s medical records that were produced by ELITE ENT, N.P. stated that no procedures were done involving her nose.  N.P. stated that s/he showed her/his insurance cards when s/he checked in to get tested.

126. A. DINH billed the Uninsured Program for four office visits with N.P. and received $33,115.93 in payments.  These payments include payments for procedures such as dilation and a biopsy that N.P. says s/he did not receive.

### c.    Patient N.N.

127. Based on a review of Medicare records, Medicaid records, and by her/his own statements, N.N. is insured by Medicare and Medicaid.  N.N. stated that s/he had no COVID-19 testing or procedure on her/his nose in 2020.  N.N. previously had sleep apnea treatment at ELITE CARE.  S/he had no surgical procedures performed by A. DINH, who s/he recognized in a picture as a provider at ELITE CARE.

128. A. DINH is registered as a "provider" with Medicare and has submitted claims to Medicare for patients, including N.N.  Specifically, A. DINH submitted claims to Medicare until August 2020, associated with N.N., for visits and procedures done in 2019.

129. In or around October and December 2020 -- just months after A. DINH had submitted claims to Medicare -- A. DINH also billed the Uninsured Program for seven office visits with N.N. and received $59,084.95 in payments.  The medical charts produced by ELITE CARE show a positive COVID-19 test for N.N., despite N.N. stating that s/he never received a COVID-19 test from A. DINH.

### d.    Patient H.V.

130. Based on a review of Medicare records, and by her/his own statements, H.V. is insured by Medicare.  H.V. stated that

s/he received a COVID-19 test at A. DINH's office on Garden
Grove Blvd., in Garden Grove, California (SUBJECT PREMISES 3) in
December 2020 or January 2021.  H.V. explained that s/he went to
A. DINH's office only to accompany her/his friend to an
appointment with A. DINH for sleep apnea.  While at A. DINH's
office, H.V. was asked by A. DINH if s/he wanted a "free" COVID-
19 test.  H.V. stated that no one at A. DINH's office asked if
s/he had insurance and opined that they must have known s/he had
Medicare because of her/his age.  Records show that H.V. was
older than 65 in December 2020.

131. H.V. received a finger prick COVID-19 test.  H.V. had
no other procedures at A. DINH's office, including any tests or
procedures on her/his nose.

132. H.V. was shown patient charts with her/his name on
them that law enforcement received from ELITE ENT, and H.V.
stated that none of the symptoms indicated were true.  The
weight listed was false and off by 25 pounds.  H.V. received
only one COVID-19 test and not multiple tests as indicated in
the patient charts shown.  H.V. never had COVID-19.

133. Two of the patient charts for patient H.V. listed a
COVID-19 positive test result, despite H.V. stating s/he never
had COVID-19.

134. A. DINH billed the Uninsured Program for three office
visits with H.V. and received $20,673.05 in payments.  These
payments include payments for procedures such as biopsies and
dilation procedures that H.V. says s/he did not receive.

e.    Patient A.R.

135. Based on a review of Medicare records, and by her/his own statements, A.R. is insured by Medicare.  A.R. stated that s/he has never heard of A. DINH or ELITE CARE.

136. A.R. stated that her/his church advertised free COVID-19 testing.  A.R. stated that at the time, s/he was not experiencing any COVID-19 symptoms and did not believe s/he had been exposed to anyone with COVID-19.  A.R. recalled that on one occasion, s/he received a finger prick test, after which s/he was given a piece of paper indicating a negative test result.

137. A.R. stated that no one asked A.R. any questions, including whether A.R. was experiencing COVID-19 symptoms or whether s/he had health insurance.

138. Agents showed A.R. certain procedure code descriptions for services billed by A. DINH to the Uninsured Program, including on June 24, 2020.  These services included, among others, complex control of nosebleed, new patient office visit lasting 60 minutes, removal of nasal air passage, and biopsy using an endoscope.  A.R. stated that s/he never received any of those services and that s/he has never had an endoscope inserted into her/his nose.

139. Agents also showed A.R. a six-page questionnaire bearing her/his name on the first page.  A.R. stated that although her/his height and weight were listed correctly, the remaining responses were false, including to questions regarding COVID-19 symptoms.  A.R. stated that s/he did not fill out the form and remarked, "This is fraud."

140. A. DINH billed the Uninsured Program for three dates of service with A.R. and received $16,873.92 in payments.  These payments include payments for procedures such as office visits and dilation procedures that A.R. says s/he did not receive.

141. The patient file for A.R. obtained from ELITE ENT shows that A.R. received a positive COVID-19 test result on June 24, 2020, despite A.R.'s statement that s/he received a negative test result.  A. DINH submitted the following claims to the Uninsured Program for services allegedly provided to A.R. on June 24, 2020, including a claim submitted on or about October 26, 2020, bearing claim number CH32733249 for patient A.R., for which HRSA paid approximately $6,454 for procedure code 31298:

| Claim Number | Date of Service | Claim Receipt Date | Provider Name | Amount Paid | Procedure Description |
|---|---|---|---|---|---|
| CH32733249 | 6/24/2020 | 10/26/2020 | ELITE ENT | $3,043 | Dilation of maxillary sinus in the nose using an endoscope |
| CH32733249 | 6/24/2020 | 10/26/2020 | ELITE ENT | $45 | Test for detection of severe acute respiratory syndrome coronavirus 2 (Covid-19) antibody, qualitative or semiquantitative |
| CH32733249 | 6/24/2020 | 10/26/2020 | ELITE ENT | $6,454 | Dilation of sphenoid and frontal sinus in the nose using an endoscope |
| CH32733249 | 6/24/2020 | 10/26/2020 | ELITE ENT | $198 | Complex control of nosebleed |
| CH32733249 | 6/24/2020 | 10/26/2020 | ELITE | $162 | Established |

| Claim Number | Date of Service | Claim Receipt Date | Provider Name | Amount Paid | Procedure Description |
|---|---|---|---|---|---|
| | | | ENT | | patient outpatient visit, total time 40-54 minutes |

### 5.   A. DINH's 15 Calls with HRSA

142. According to HRSA call records, A. DINH made at least 15 inquiries to HRSA regarding his claims to the Uninsured Program, on behalf of ELITE CARE (5 calls), ELITE ENT (7 calls), and GARDEN GROVE (3 calls).  These calls took place between June 19, 2020, and August 13, 2020, and the call notes identified A. DINH as the caller.  The comments regarding the topic of the calls varied.  For example, A. DINH called HRSA to ask for certain billing codes, to ask about provider enrollment and banking information, patient roster submission, to verify that claims had been submitted, and to check on the status of payment for claims submitted.

### 6.   Interview of A. DINH

143. On March 22, 2021, agents conducted a voluntary interview with A. DINH.  A. DINH was represented by counsel, and there was no agreement regarding limitations as to the use of statements made by A. DINH during that interview.  During the interview, A. DINH stated that he is the owner, CEO, and sole director of ELITE CARE, ELITE ENT, and GARDEN GROVE.  He stated that ELITE ENT is where office visits and business operations are conducted (SUBJECT PREMISES 2), and GARDEN GROVE is where surgical procedures are performed (SUBJECT PREMISES 3).  A. DINH stated that he is the only ENT physician at ELITE CARE, but two

other physicians work there.  A. DINH could not remember the first name of one of the physicians.

144. A. DINH stated that he conducted COVID-19 tests in his offices and at off-site locations such as temples and churches. A. DINH claimed that he personally saw 50, 60, or even 100 patients a day.  He claimed that the billers, including H. DINH, submitted claims to the Uninsured Program.  A. DINH completed a superbill[10] for each patient chart and circled which procedures were performed for each patient.

145. A. DINH admitted he knew that the Uninsured Program was for reimbursement related to claims for uninsured patients. A. DINH said he did not think patients were screened for insurance, and he did not have a method to check whether a patient had insurance or not.

146. A. DINH claimed that another employee, a Certified Registered Nurse Anesthetist, performed nasal irrigation procedures billed to the Uninsured Program.  However, that employee was interviewed and said that A. DINH's companies were mostly conducting COVID-19 testing and not performing procedures.

7. Witnesses' Identification of H. DINH as the Biller

147. In addition to A. DINH, Former Employee 1, a former employee of ELITE CARE, ELITE ENT, and GARDEN GROVE claimed that

---

[10] A "superbill" is typically a document that indicates the services provided to a patient along with the appropriate billing codes necessary for reimbursement by an insurance company.

H. DINH conducted billing for the three companies somewhere outside of the office and came into the clinic to pick up paperwork or various billing materials.

148. From my conversations with other law enforcement agents and training and experience, I know that billers are often responsible for submitting claims and lists of patients that purportedly qualify to be billed under the Uninsured Program, and making attestations or certifications as to the accuracy of the submitted claims on behalf of the billing entities.

### 8.  Money Laundering

149. A financial analysis revealed that A. DINH laundered funds he received through his Uninsured Program fraud scheme by transferring the proceeds to bank accounts held by shell companies owned by him, often commingling the proceeds with loan funds from the PPP and EIDL Program fraud scheme, and then transferring the proceeds to A. DINH's personal bank accounts.

150. For example, on July 6, 2020, A. DINH opened a checking account in the name of a company called Mekong Crest Inc. ("MEKONG CREST") with Wells Fargo (the "MEKONG CREST WF Account").  MEKONG CREST was incorporated in Nevada in 2015. According to Nevada Secretary of State records, A. DINH is the president of MEKONG CREST.  A. DINH is the sole signatory on the bank account.

151. Following opening of the account, approximately $7.3 million in Uninsured Program payments to A. DINH, originally deposited into the ELITE CARE, ELITE ENT, and GARDEN

GROVE bank accounts, was transferred into the MEKONG CREST WF
Account.  Following receipt of the $7.3 million in proceeds, A.
DINH transferred the funds to his personal bank accounts, as
well as to other accounts he owned.  From there, A. DINH
transferred the funds to several different personal brokerage
accounts:



152. As another example, a Nevada corporation named
Panaeco, for which A. DINH is the president, had a business
checking account (the "Panaeco Account") with essentially no
activity other than Uninsured Program and EIDL Program deposits.
A. DINH opened the account on May 26, 2020.  Approximately
$4.1 million in Uninsured Program payments originally deposited
into ELITE CARE and ELITE ENT bank accounts were transferred
into the Panaeco Account.  Financial records show that following
those deposits, A. DINH transferred over $4 million into his
personal bank accounts, and then from there transferred the
proceeds to his personal brokerage accounts.

153. Agents have traced Uninsured Program proceeds to A. DINH's personal bank accounts, which were then used to purchase a home in Lake Forest, California, for approximately $1.1 million on or about February 23, 2021.  A. DINH transferred this property to his wife via a grant deed on or about March 21, 2022.

154. According to financial records, using the funds transferred into A. DINH's personal brokerage accounts, A. DINH engaged in high-risk options trading and lost over $100 million between November 2020 and February 2022.

## VII.  PROBABLE CAUSE THAT THE EVIDENCE SOUGHT IS MAINTAINED AT THE SUBJECT PREMISES

### A.    ELITE ENT and GARDEN GROVE

155. In his March 2021 interview, A. DINH stated that ELITE CARE and GARDEN GROVE were located at the same address but are separate suites divided by walls.  A. DINH also noted that ELITE ENT sees patients for office visits and GARDEN GROVE is a surgery center.

a.   California Secretary of State records show that the most recent principal address for ELITE ENT is 13132 Magnolia St., Garden Grove, California 92844 (the "Magnolia Street Address"), as of April 25, 2022.

b.   California Secretary of State records show that the most recent principal address for GARDEN GROVE is A. DINH's residence, ███████ (SUBJECT PREMISES 4), and that the street address of the agent for service of process, A. DINH, is the Magnolia Street Address.

54

c.   Based on witness interviews, ELITE ENT is located within Suite A of the Magnolia Street Address (SUBJECT PREMISES 2) and GARDEN GROVE is located within Suite B of Magnolia Street Address (SUBJECT PREMISES 3).

156.   In a Medicare application for his individual physician practice[11] submitted on August 5, 2019, A. DINH listed the Magnolia Street Address as the practice location and location where medical records are stored.  A review of Medicare records shows that this address has not been updated.

157. According to database checks conducted in February 2023, the building in which ELITE ENT operates is owned by Prestige Property Investment Co., Inc.  As referenced above, Prestige Property Investment Co., Inc. was listed as A. DINH's business until April 2022, when it was placed in the name of his wife.  This change was made after agents conducted an interview on March 22, 2021, with A. DINH regarding his billing to the HRSA Uninsured Program.

158. In January 2023, agents conducted surveillance of ELITE ENT (SUBJECT PREMISES 2), GARDEN GROVE (SUBJECT PREMISES 3), and the Magnolia Street Address, and saw evidence that the businesses were still in operation:

---

[11] To participate as a provider in the Medicare program, providers are required to submit an application in which the provider agrees to comply with all Medicare-related laws and regulations.  Such applications contain a Certification Statement that, among other items, certifies that the information within the application is true, correct, and complete.  A. DINH is enrolled as a Medicare provider for his physician practice, in addition to providing services on behalf of his other Medicare-enrolled business entities.

a.    On January 10, 2023, agents saw the entrance gate open with a vehicle parked inside.  The next day, the entrance gate was closed with three vehicles parked inside.

b.    On January 17, 2023, the entrance gate was closed with two vehicles parked inside.

c.    On January 25, 2023, seven vehicles were parked inside the gate.  According to a review of vehicle registration information, two of the vehicles are registered to A. DINH, one of the vehicles is registered to the wife of A. DINH, and one of the vehicles is registered to Employee 1, a Registered Nurse employed at GARDEN GROVE.  According to the insignia above the entrance gate to the parking garage, the parking garage was labeled as parking for ELITE ENT and/or GARDEN GROVE.  Toward the back of the parking garage, agents observed a glass entrance door to the building, with a light on inside.

159. Information obtained by agents in February 2023 also supports that ELITE ENT and GARDEN GROVE are in operation:

a.    In February 2023, agents confirmed with USPS that ELITE ENT and GARDEN GROVE still receive mail at the Magnolia Street Address.

b.    February 2023 records from Southern California Edison show that A. DINH is the account holder for accounts which service the Magnolia Street Address and that those accounts were active as of February 2023, including Units A (SUBJECT PREMISES 2) and B (SUBJECT PREMISES 3) of the Magnolia Street Address.

c.    February 2023 records from Southern California

Gas Co. show that A. DINH is the account holder for an account which services the Magnolia Street Address and that the account was active as of January 27, 2023.

160. In or around February 2023, a confidential source called the publicly-listed phone number for ELITE ENT and was able to schedule a medical appointment for March 2023.

161. The IP address associated with ELITE ENT (SUBJECT PREMISES 2) was used to submit electronic data and patient information to the HRSA Uninsured Program in March 2021.

162. Additionally, the IP address associated with ELITE ENT (SUBJECT PREMISES 2) was used to create various email accounts that submitted fraudulent PPP and EIDL Program loan applications, including an application on behalf of SPECTRUM NETWORK. As of January 25, 2023, the IP address for ELITE ENT is still active.

**B.   ELITE CARE**

163. As described above, Medicare records show that A. DINH is enrolled as a Medicare provider. A. DINH submitted Medicare applications for ELITE CARE on October 28, 2018, March 12, 2019, and October 3, 2019. A. DINH listed 13794 Beach Blvd., Suite B, Westminster, California 92683 (SUBJECT PREMISES 1) as the practice location and storage location for medical records for ELITE CARE on the most recent Medicare application. California Secretary of State records show that the most recent address for ELITE CARE was also SUBJECT PREMISES 1 as of April 25, 2022. A review of the Provider Enrollment, Chain, and Ownership System,

a Medicare database, in March 2023, did not identify any update in the business location for ELITE CARE from SUBJECT PREMISES 1.

164. A. DINH also listed SUBJECT PREMISES 1 for ELITE CARE on an "Electronic Data Interchange" ("EDI") Form submitted to Medicare dated March 19, 2020. By completing and submitting the EDI Form, A. DINH agreed to retain all original source documentation and medical records pertaining to Medicare claims for at least six years.

165. I understand from other agents in this investigation that original patient records can be obtained through executing a search warrant that may uncover evidence of falsification such as white-out, copy and paste activity, or other manipulations to documents including patient files, whether or not such documents are typed, printed out, or handwritten documents. From my conversations with other agents, I understand that these patient charts are typically retained at the places that conducted the business that was billed to insurers, even years after the date of service, due to record retention requirements in place such as those by the HRSA Uninsured Program and Medicare, both of which ELITE CARE is bound by.

166. According to database checks conducted in February 2023, the building in which ELITE CARE operates is owned by Prestige Property Investment Co., Inc. As stated, California Secretary of State records for Prestige Property Investment Co., Inc. identified A. DINH as president, incorporator, and manager until April 2022 when a Statement of Information was filed identifying A. DINH's wife as CEO, CFO, secretary, director, and

registered agent.  This change was made after agents conducted
an interview on March 22, 2021, with A. DINH regarding his
billing to the HRSA Uninsured Program.

167. In January 2023, agents conducted surveillance of
SUBJECT PREMISES 1.  The parking lot was observed to be empty on
multiple occasions.  However, agents did observe three security
cameras located outside of the building.

168. In February 2023, agents conducted a site visit at
SUBJECT PREMISES 1.  Through the public street view and around
the building, agents were able to obtain partial views of
several rooms of the building.  Several rooms appeared to be not
in active use and somewhat bare, but some were observed to
contain a gurney, file cabinet, wrapped furniture, boxes, and
bookshelves full of books.

169. In February 2023, agents checked with the post office
that handles the mail delivery to ELITE CARE and were advised
that mail was still being delivered to SUBJECT PREMISES 1 and no
forwarding address was filed.

170. IP address records obtained throughout the
investigation show that the Subject Premises were used in
furtherance of the fraud schemes.  For example, the IP address
associated ELITE CARE (SUBJECT PREMISES 1) was used to submit
electronic data and patient information to the HRSA Uninsured
Program in March 2021.[12]

---

[12] IP addresses beyond March 2021 were unable to be obtained
from HRSA.

171. Bank of America records show that, on April 13, 2022, A. DINH opened an account in the name of ELITE CARE, 13794 Beach Blvd., Suite B, Westminster California (the "ELITE CARE BoA Account"). A. DINH has sole signatory authority for the ELITE CARE BoA Account. The statement ending February 28, 2023, bears the address of ELITE CARE (SUBJECT PREMISES 1).

172. Recent activity in January and February 2023 was conducted in the ELITE CARE BoA Account. For example,

a.   Between December 14, 2022, and December 16, 2022, the total for cash deposits into the ELITE CARE BoA Account was $25,600.

b.   On January 5, 2023, A. DINH transferred $6,020 via Zelle out of the ELITE CARE BoA Account to his personal account.

c.   On February 3, 2023, $3,000 was transferred to Employee 1, a registered nurse employed at GARDEN GROVE, from the ELITE CARE BoA Account. A vehicle registered to Employee 1 was observed at the Magnolia Street Address on January 25, 2023.

**c.** ▮▮▮▮▮▮▮▮

173. On California Secretary of State documents pertaining to ELITE CARE, ELITE ENT, and GARDEN GROVE described above, A. DINH also listed his "Officer Address" as ▮▮▮▮▮▮▮ (SUBJECT PREMISES 4).

174. Database checks in February 2023 reflect that A. DINH's wife owns the property at ▮▮▮▮▮▮ (SUBJECT PREMISES 4) and that the property was transferred to her via a grant deed

from A. DINH recorded on March 16, 2022.  Property records also
indicate that A. DINH's business, Prestige Property Investment
Co., Inc., also held the deed to the property.

175. Loan application and IP address records show that the
IP address associated with ███████████ (SUBJECT PREMISES 4) was
used to submit over 25 PPP and EIDL Program applications from
March through August 2020.

176. HRSA records show the IP addresses associated with ██
███████, ELITE ENT, and ELITE CARE were used to submit
electronic data, patient information, or both to the HRSA
Uninsured Program in March 2021.

177. A. DINH listed the email address ████████@yahoo.com"
on at least ten PPP and EIDL Program applications, including on
behalf of ELITE CARE, ELITE ENT, and GARDEN GROVE.  Subscriber
records for this email address reveal that the account was
established in 2004.  As recent as February 21, 2023, the email
account was active on over 100 occasions from the IP address
associated with ████████.

178. In January 2023, agents conducted surveillance of ██
████████ (SUBJECT PREMISES 4).  There was a vehicle parked in
the driveway.  A query of the license plate revealed that the
vehicle is registered to A. DINH.  Agents observed a male and
two females leave the location in the vehicle.

179. In February 2023, agents learned from employees of the
post office that handles the mail delivery to ████████████
(SUBJECT PREMISES 4) that the address was a "permanent" family
residence for A. DINH, as of September 3, 2022.

180. As stated in paragraph 53, above, California Secretary of State records for Prestige Property Investment Co., Inc. identified A. DINH as president, incorporator, and manager until April 2022 when a Statement of Information was filed identifying A. DINH's wife as CEO, CFO, secretary, director, and registered agent, with ███████████ (SUBJECT PREMISES 4) as the registered agent address.

181. On or about February 24, 2023, agents obtained the contents of trash and recycling bags which had been recovered from ███████████ (SUBJECT PREMISES 4) that same day. From the bags, agents obtained an IRS Form 941 in the name of HODIGEN, 13794 Beach Blvd., Suite D, Westminster, California 92683 for the time period January 1, 2020, through March 31, 2020.

    a.   The Form 941 reported wages of $350,400.02, the exact same amount of wages listed on the Form 941 that A. DINH submitted to Lender 3 on August 3, 2020, for the $292,000 PPP loan for HODIGEN.

    b.   There was also a handwritten telephone number on the seized Form 941 of (████████-3086. Subscriber records reveal that this telephone number is registered to ELITE CARE at SUBJECT PREMISES 1.

182. In the trash, agents also recovered a solicitation letter for a loan to "Elite Ent & Plastic Surgery Medi" at ██ ███████████ (SUBJECT PREMISES 4). This solicitation suggests that A. DINH receives certain correspondence regarding his businesses at ███████████ (SUBJECT PREMISES 4).

183. February 2023 records from Southern California Edison show that A. DINH is the account holder for an account tied to service at ████████ (SUBJECT PREMISES 4) that was active as of February 2023.

184. Bank of America records show that on March 1, 2022, A. DINH opened an account in the name of A. DINH (the "A. DINH BoA Account"), using ████████ (SUBJECT PREMISES 4) as the address. A. DINH has sole signatory authority for the account. Bank records show that this account remains active and reflect transactions involving his medical businesses. For example, on February 14, 2023, $17,533.33 was transferred from the A. DINH BoA Account to Arete Diagnostic. On February 16, 2023, $3,000 was transferred from the A. DINH BoA Account to Employee 1, a registered nurse.

185. It has been my experience that, especially since the COVID-19 pandemic, business owners, executives, and some employees have locations in their homes where they conduct business, commonly referred to as telework. This may include phone calls, emails, reviewing documents, and filing various business records. Such business can involve computers, including laptops or other electronic devices, contracts, or other documents or paperwork to provide easy access and permit individuals to effectively work from home.

186. Additionally, from my training and experience, I know that individuals, such as owners of fraudulent businesses, store important records and financial documents in their fraud scheme at their homes, rather than their places of work. This could be

for fear of being discovered by others or of employees
accidentally viewing such documents at businesses when left out
and thus becoming aware of their illegal acts.

   **D.   Types of Records**

   187. Based on my training and experience and conversation
with law enforcement officers involved in investigations
involving illegal health care businesses, including experience
gained in executing search warrants for records and other
evidence, I know:

      a.   The records and items described in Attachment B
are the type of records and items kept in the normal course of
business for health care businesses such as the ELITE CARE,
ELITE ENT, and GARDEN GROVE.

      b.   Health care businesses such as ELITE CARE, ELITE
ENT, and GARDEN GROVE commonly maintain: records relating to
patient care, including, clinical files and patient records,
records relating to the preparation of patient files such as
partially completed forms, pre-printed forms, pre-signed forms,
missing or incomplete medical records such as lists of patients,
and identifying information such as insurance information, date
of birth, and address information; records pertaining to audits
or record requests such as subpoenas; other memoranda, notes,
correspondence, lists, logs, emails, and ledgers; and records of
individuals providing services to patients such as admitted
patient lists, employee assignments or tasks, schedules, and

other records identifying the patients and doctors, Registered Nurses, and others assigned to provide patient services.

      c.   Health care related businesses generally maintain patient records for several years at their business locations so they may be accessed for record requests as related to billing and payment purposes.  There is a three-year record retention requirement set into place for the HRSA Uninsured Program in the HRSA Terms and Conditions for such purposes.  Additionally, based on discussions with others and my familiarity with Medicare regulations for those who submit claims to the Medicare program, Medicare providers are required to retain patient records for six years after the claim was paid.

      d.   It is customary for individuals, businesses, and related employees, agents, clients, and individuals otherwise connected with the operation of clinics and outpatient surgery centers to maintain certain types of records in order to function in the financial aspects of their businesses and to otherwise continue their day-to-day operations.  These records include items listed in Attachment B, which are normally maintained at locations to which these individuals would have ready access.

      e.   It is common for individuals who engage in fraudulent activities to maintain records or other evidence relating to their obtaining, tracking, secreting, transferring, concealing, and/or expending the proceeds of their criminal activity, such as: books, records, invoices, receipts, ledgers, sign-in sheets, bank statements and related records,

certificates of deposits, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, and other evidence of financial transactions.

188. Therefore, based on the ongoing operation of ELITE CARE, ELITE ENT, and GARDEN GROVE at the Subject Premises; Secretary of State records; Medicare records; IP address inquiries; bank records; USPS mail records; ownership records of the building locations; utility information; email activity; and recent surveillance, there is probable cause to believe that ELITE CARE, ELITE ENT, and GARDEN GROVE currently operate and maintain evidence of the Subject Offenses at SUBJECT PREMISES 1-3.

189. Further, based on the evidence related to the fraudulent acts conducted from the residence at ██████████ (SUBJECT PREMISES 4); IP address inquiries; bank records; ownership records of the residence; utility information; email subscriber records; records obtained from trash and recycling bags; and recent surveillance, there is probable cause to believe that business records pertaining to the PPP and EIDL loan fraud scheme and the fraudulent billings submitted to and paid for by the HRSA Uninsured Program will be maintained at █ ██████ (SUBJECT PREMISES 4), which is currently owned by A. DINH's wife (but was previously owned by A. DINH) and is where A. DINH resides, and which likely maintains evidence of the Subject Offenses.

VIII.      **ADDITIONAL TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[13]

190. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[13] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

191. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

68

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

192. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

69

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the thumb and/or fingers of A. DINH and H. DINH on the device(s); and (2) hold the device(s) in front of A. DINH's and H. DINH's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

193. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### IX. <u>RETENTION OF INFORMATION FOR AUTHENTIC PURPOSES</u>

194. In anticipation of litigation relating to the authenticity of data seized pursuant to the search warrant, I request that the government be allowed to retain a digital copy of all seized information authorized by the warrants for as long as is necessary for authentication purposes.

**X.   AVOIDING UNNECESSARY DISRUPTION TO BUSINESS OPERATIONS**

195. ELITE CARE, ELITE ENT, and GARDEN GROVE are functioning businesses.  The government will execute the requested warrants in a reasonable manner, which will likely involve conducting an investigation on the scene of what computers or storage media must be seized or copied, and what computers or storage media need not be seized or copied.  Where appropriate, agents will copy data, rather than physically seize computers or storage media, to reduce the extent of disruption.  To minimize disruption to any legitimate medical needs of patients, the seizing agents will implement the procedures set forth in Attachments C-1 through C-3, which are incorporated herein by reference.  The procedures provide that, upon written request from ELITE CARE, ELITE ENT, GARDEN GROVE, and/or a patient, the government will provide ELITE CARE, ELITE ENT, GARDEN GROVE, and/or the patient with a copy of any medical treatment information it has seized regarding that patient within 48 hours (excluding weekends and holidays).

**XI. SEARCH PROCEDURE**

196. I request that with respect to law enforcement's review of the information seized pursuant to this warrant, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the seized information (collectively, the "Search Team") be authorized to review, in the first

instance, the seized information and the information and materials contained in them, as set forth in this Attachment.

## XII. **CONCLUSION**

197. For all the reasons described above, there is probable cause to believe that A. DINH, H. DINH, and HO submitted multiple fraudulent loan applications under the PPP and EIDL Programs and that A. DINH engaged in a scheme to defraud HRSA by submitting false and fraudulent claims for treatment of purportedly uninsured patients, when the alleged services were not rendered, were not medically necessary, and/or were for patients who were in fact insured.  Thus, there is probable cause for the requested complaint and arrest warrants for A. DINH, H. DINH, and HO for violations of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1347 (health care fraud; A. DINH only), and for the requested warrants to search the Subject Premises and Persons, described in Attachments A-1 through A-6, for the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of the Subject Offenses.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 10th day of April, 2023.

_____ PVC
UNITED STATES MAGISTRATE JUDGE